UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

GEOSYNFUELS, LLC ,

         Plaintiff,   :   Index No. _____/08

                :

    -against-         :   **COMPLAINT**

JOHN D. SANTOLERI and ERNEST H.  :
POMERANTZ, as co-Executors of
The Estate of ADAM SOLOMON; and  :
CHARLES SCHWAB & CO., INC. in its capacity  :
as Custodian of the Individual Retirement Account  :
of ADAM SOLOMON

        Defendants.  :
-------------------------------------------------------------X

    Plaintiff GeoSynFuels, LLC, by its attorneys, Kornstein Veisz Wexler & Pollard, LLP,

for its complaint, alleges:

<u>The Nature of This Action</u>

    1.   This is an action to obtain payment of $300,000 that Adam Solomon agreed to

invest in GeoSynFuels, LLC ("GeoSynFuels") under a written Subscription Agreement that he

signed on March 24, 2008.  A copy of the Subscription Agreement, upon which this action is

based, is annexed as Exhibit A.

    2.   Mr. Solomon, a professional money-manger and investor, committed a total of

$500,000 to GeoSynFuels, $200,000 on behalf of three trusts and $300,000 on his own behalf.

The $200,000 that he decided to invest on behalf of the trusts was wired from the trust accounts

to GeoSynFuels on March 31, 2008.

3.      On information and belief, Mr. Solomon simultaneously directed Charles Schwab, the custodian of his IRA account, to transfer $300,000 to GeoSynFuels for his personal investment.  Three days later Mr. Solomon died, suddenly and unexpectedly, at the age of 55. His contractual commitment to invest $300,000 of his personal funds in GeoSynFuels has since been disregarded by his Estate representatives and by Charles Schwab, notwithstanding the binding contract that Mr. Solomon entered into.

4.      GeoSynFuels therefore brings this action against the representatives of Mr. Solomon's Estate and the Custodian of his IRA account, to complete the transaction to which he committed himself: a transaction requiring his payment of $300,000 in return for 11,538.5 of the company's shares.

## Jurisdiction and Venue

5.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a)(1), as the matter in controversy exceeds $75,000 and is between citizens of different States.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2), because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District and all defendants reside in this District.

## The Parties

7.      Plaintiff GeoSynFuels is a Delaware limited liability company whose principal place of business is Golden, Colorado.  GeoSynFuels is authorized to conduct business in the State of New York.

8.      Adam Solomon, at all relevant times prior to his death on April 3, 2008, resided at 956 Fifth Avenue, New York, New York 10075.

9.    Defendant John Santoleri resides in this District at 101 West 67th Street, Manhattan.

10.    Mr. Santoleri was named the executor of Mr. Solomon's Estate in Mr. Solomon's Last Will and Testament. On April 15, 2008, the Surrogate's Court, New York County, issued Preliminary Letters Testamentary to Mr. Santoleri.

11.    Defendant Ernest Pomerantz resides in this District at 430 East 84th Street in Manhattan.

12.    On April 9, 2008, Mr. Santoleri, by affidavit submitted with the Petition for Probate, appointed Mr. Pomerantz as a "co-executor of the will," and requested that letters testamentary also be issued to Mr. Pomerantz.

13.    Defendant Charles Schwab & Co., Inc. ("Schwab") is a California corporation with a principal place of business at 101 Montgomery Street, San Francisco, California. Schwab is authorized to conduct business in the state of New York and maintains offices in New York County.

## The Facts

14.    Adam Solomon was a particularly astute and experienced investor. At the time of his death, at age 55, he was the chairman of Stonewater Capital, LLC. Prior to Stonewater, he was chairman of Shaker Investments, which he founded and through which he managed assets of over $2 billion.

15.    Prior to founding Shaker Investments, Mr. Solomon obtained a masters degree in business administration from MIT, and worked as an investment banker and venture capitalist at Solomon Brothers and Warburg Pincus.

3

16.     Mr. Solomon was described in his death certificate as a philanthropist and entrepreneur.

17.     He was, in short, supremely qualified to make investment decisions and to enter into investment contracts, as he did with GeoSynFuels.

18.     On March 24, 2008, approximately three months after receiving a Private Placement Memorandum to ("PPM") relating to the offering, Mr. Solomon formalized his decision to invest in GeoSynFuels by entering into four Subscription Agreements for newly issued shares.

19.     Pursuant to three of these agreements, a total of $200,000 was to be invested by trusts over which Mr. Solomon had control or influence.  Through these agreements, Mr. Solomon agreed to invest $100,000 on behalf of the Anthony M. Solomon Charitable Lead Annuity Trust, for which he was the trustee; $50,000 on behalf of the Peter Adam Solomon Trust; and $50,000 on behalf of the Janus Slater Solomon Trust.  (These agreements are referred to, collectively as the "Trust Subscription Agreements," and are annexed as Exhibits B, C and D.)

20.     One week after the Trust Subscription Agreements were entered into, on March 31, 2008, Mr. Solomon wired payments from the Trusts' accounts to GeoSynFuels.  No issue exists with respect to any of the Trust Subscription Agreements, which were fully complied with. By wiring the trust funds to GeoSynFuels, Mr. Solomon demonstrated his continuing commitment to his investment decision and agreements.

21.     Mr. Solomon chose to invest the remaining $300,000 on his own behalf, and executed another Subscription Agreement (the "Individual Subscription Agreement") which so

states. Mr. Solomon entered the name of the subscriber on this agreement as "Adam Solomon IRA." Demonstrating that he viewed this as a personal obligation, Mr. Solomon executed the Individual Subscription Agreement on the signature line for an "Individual Subscriber" rather than an "Entity Subscriber", filled out an appendix ("Appendix B") in spaces provided for "natural persons" rather than "entities", and checked two boxes in another appendix ("Appendix A") indicating that he held "Accredited Investor Status" as a "natural person" whose "individual net worth" and "individual income" met the criteria for individual investors. (These documents are annexed, collectively, in Exhibit A.)

22.     The Individual Subscription Agreement was signed and submitted by Mr. Solomon on March 24, 2008. On March 31, 2008, GeoSynFuels countersigned the Individual Subscription Agreement, indicating that it had been "agreed and accepted," and returned it to Mr. Solomon.

23.     Pursuant to the terms of the Individual Subscription Agreement, the $300,000 that Mr. Solomon agreed to pay for the shares was then payable "by wire transfer of immediately available funds." (Exhibit A, Section 1.2) The PPM relating to the offering similarly states that subscribers must "deliver to the Company as promptly as possible . . . an amount equal to the aggregate purchase price for the common shares subscribed for by the investor in a certified or official bank check, or by wire transfer to the Company's account as set forth in the Subscription Agreements." The PPM containing this requirement was delivered to Mr. Solomon on January 14, 2008. The pertinent page of the PPM, entitled Subscription Procedures, is annexed as Exhibit E.

24.     The essence of the Individual Subscription Agreement is simple and straight

forward. Mr. Solomon agreed to transfer $300,000 to GeoSynFuels for 11,538.5 shares of the company. His obligation now falls upon those who are duty-bound, as his executors or otherwise, to carry out Mr. Solomon's contractual obligations and directions.

<u>FIRST CAUSE OF ACTION</u>
(Breach of Contract Against the Estate of Adam Solomon)

25.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 24 of this complaint.

26.    The Individual Subscription Agreement was a valid, executed, and binding agreement between GeoSynFuels and Mr. Solomon.

27.    By executing the Individual Subscription Agreement on March 24, 2008, Mr. Solomon bound himself to deliver $300,000 to GeoSynFuels in return for the shares that he purchased. Upon his death, Mr. Solomon's contractual obligations became a binding obligation of his Estate.

28.    Mr. Solomon's Estate is not only obligated to satisfy his agreement to invest $300,000 in GeoSynFuels, it is also fully capable of doing so. Papers that Mr. Solomon's executor filed in the Surrogate's Court estimated that the Estate holds approximately $12 million in personal property, and his overall wealth is believed to far exceed that amount.

29.    Plaintiff has fulfilled all its obligations under the Individual Subscription Agreement.

30.    To date, neither Mr. Solomon nor any representative of his Estate has paid Plaintiff the $300,000 that he owed to GeoSynFuels under the Individual Subscription Agreement, despite the fact that the amount is due and payable.

31.    As a result of the failure to comply with the Individual Subscription Agreement,

GeoSynFuels has suffered damages in the sum of $300,000.

## SECOND CAUSE OF ACTION AGAINST SCHWAB
## AS CUSTODIAN OF THE SOLOMON IRA
### (Breach of Contract)

32.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 24 of this

complaint.

33.    At the time that he entered into the Individual Subscription Agreement, Mr.

Solomon identified the Subscriber as the Adam Solomon IRA and, on information and belief,

directed Schwab to wire $300,000 from his IRA account to GeoSynFuels.

34.    As a matter of law, Mr. Solomon, rather than Schwab, had the power to determine

how funds in his IRA Account were to be invested or otherwise utilized.  As a custodian of Mr.

Solomon's account, Schwab was obligated to honor his investment decisions, and to allocate

funds as he directed.

35.    Schwab, moreover, has no power or authority to negate contracts that Mr.

Solomon entered into, by which he undertook to transfer funds in return for shares or any other

consideration.

36.    Accordingly, in the event that Mr. Solomon's Estate does not fully honor his

obligation to pay $300,000 to GeoSynFuels, GeoSynFuels is entitled to an order requiring

Schwab or any subsequent custodian of Mr. Solomon's IRA account to transfer $300,000 from

that account to GeoSynFuels.

WHEREFORE, plaintiff demands judgment:

7

a. On the first claim, awarding plaintiff the $300,000 that Solomon agreed to pay to GeoSynFuels pursuant to the Individual Subscription Agreement, plus interest;

b. On the second claim, compelling Schwab to comply with the Individual Subscription Agreement and thus to remit $300,000, plus interest, pursuant to the Individual Subscription Agreement; and

c. Granting such other and further relief as the Court may deem just and proper, including interest, plaintiff's costs and reasonable attorneys' fees.

Dated:  New York, New York
       August 6, 2008

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By: _____
       Howard S. Veisz (HSV - 2666)
757 Third Avenue
New York, New York 10017
(212) 418-8600

Attorneys for Plaintiff

# Exhibit A

# SUBSCRIPTION AGREEMENT

GeoSynFuels, LLC
12345 West Alameda Parkway, Suite 310
Lakewood, Colorado 80228

Ladies and Gentlemen:

## SECTION 1. Subscription.

1.1    GeoSynFuels, LLC, a Delaware limited liability company (the "Company"), is offering for sale an aggregate of up to 310,000 of the Company's common shares (the "Common Shares"). The undersigned (the "Subscriber") hereby subscribes for the purchase of such number of Common Shares as set forth on the signature page hereto, for the consideration set forth on the signature page hereto (the "Purchase Price") (such subscription referred to herein as the "Subscription"). The terms of the offering of the Common Shares, the risks associated with ownership of the Common Shares and descriptions of the Company, its business and the Common Shares are set forth in that certain Confidential Private Placement Memorandum dated August 7, 2006 (the "Memorandum").

1.2    The Subscriber shall fully complete this Agreement, including Appendices A and B attached hereto. Upon the execution hereof, the Subscriber shall deliver to the Company (i) two (2) executed copies of this Agreement and (ii) the Purchase Price, which shall be payable by a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to the following account:

> Wells Fargo Bank, Colorado, N.A.
> 1740 Broadway
> Denver, Colorado 80274
> ABA# 121000248
> Swift Code: WFBIUS6S
> For credit to the account of:
> > GeoSynFuels, LLC
> > 12345 West Alameda Pkwy, Suite 310
> > Lakewood, Colorado 80228
> > Account # 6402156712

1.3    As soon as practicable after receipt of the foregoing items, the Company shall notify the Subscriber whether the Subscription has been accepted in whole or in part. If the Company accepts all or a portion of the Subscription, this Agreement shall become effective, and the Company shall promptly deliver to the Subscriber one (1) fully-executed copy of this Agreement, countersigned by the Company.

## SECTION 2. Representations and Warranties of the Company. The Company represents and warrants to the Subscriber that this Agreement has been duly authorized, executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws now or hereafter in effect relating to

creditors' rights generally and by general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3. **Representations and Warranties of the Subscriber.** The Subscriber represents and warrants to the Company that:

3.1   The Subscriber has knowledge and experience in financial and business matters sufficient to enable it to evaluate the merits and risks of an investment in the Common Shares.

3.2   The Subscriber is acquiring the Common Shares hereunder for its own account, solely for investment and not with a view to the resale or distribution thereof within the meaning of the Securities Act of 1933, as amended (the "Act"). The Subscriber acknowledges that there is no public market for the Common Shares, and none is likely to develop in the near future.

3.3   The Subscriber understands that its investment in the Common Shares entails a high degree of risk. The Subscriber understands that its acquisition of the Common Shares will be a highly speculative investment, and, without impairing its financial condition, it is able to hold the Common Shares for an indefinite period of time and to suffer a complete loss of its investment.

3.4   The Subscriber has had an opportunity to ask questions of and receive answers from the Company and its officers and directors concerning the terms and conditions of the sale of the Common Shares contemplated hereby and has had an opportunity to obtain additional information from the Company to the extent deemed necessary or advisable by the Subscriber in order to verify the accuracy of the information obtained. The Subscriber has, to the extent deemed necessary by the Subscriber, consulted with its own advisors (including the Subscriber's attorney, accountant or investment advisor) regarding the Subscriber's investment in the Common Shares and understands the significance and effect of its representations, warranties, acknowledgments and agreements set forth in this Agreement.

3.5   The Subscriber has received from the Company a copy of this Memorandum. The Subscriber has, to the extent deemed necessary by the Subscriber, completed due diligence and an independent investigation concerning the Company and the terms and conditions of the sale of the Common Shares contemplated hereby. The Subscriber is aware that the Company is subject to the risks detailed in this Memorandum. The Subscriber acknowledges that there can be no assurance the Company will be successful in the implementation of its business plan, and a total loss of the Subscriber's investment in the Company is possible.

3.6   The Subscriber acknowledges that neither the Company, nor any of its officers, directors, representatives or affiliates, nor any other person or entity, has made any representations or warranties with respect to the Company, its business or any Common Shares other than as set forth herein and in this Memorandum.

3.7   The Subscriber understands that the Common Shares have not been registered under the Act in reliance upon an exemption from the registration requirements of the Act pursuant to Section 4(2) thereof, that the Common Shares have not been registered under applicable state securities laws, and that the Common Shares may not be sold or otherwise disposed of unless registered under the Act and applicable state securities laws (the Company being under no obligation to so register such Common Shares) or exempted from registration. The Subscriber further understands that the exemption from registration afforded by Rule 144 promulgated under the Act is not presently available with respect to the Common Shares.

3.8  The Subscriber understands and acknowledges that any certificate representing the Common Shares owned or held by the Subscriber will be inscribed with a restrictive legend substantially as follows:

"THE COMMON SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED PURSUANT TO THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW. NEITHER THESE COMMON SHARES, NOR ANY PORTION THEREOF OR INTEREST THEREIN, MAY BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THE SAME ARE REGISTERED WITH AND QUALIFIED IN ACCORDANCE WITH SAID ACT AND ANY APPLICABLE STATE SECURITIES LAW OR, IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, SUCH REGISTRATION AND QUALIFICATION ARE NOT REQUIRED."

3.9  The Subscriber is an "Accredited Investor" as such term is defined in Rule 501 of Regulation D promulgated under the Act and has accurately completed Appendix A to this Agreement.

3.10  The Subscriber acknowledges that neither the Company nor any person or entity acting on its behalf has offered to sell any of the Common Shares to the Subscriber by means of any form of general solicitation or advertising, including without limitation (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media, or broadcast over television or radio, and (ii) any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

## SECTION 4. General.

4.1  Notices.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered to the parties at the addresses set forth below or on Appendix B, as applicable, as the same may be modified from time to time. Each such notice, request, demand or other communication shall be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number set forth below or on Appendix B, as applicable, if such facsimile is transmitted on a business day, and if not, then on the next business day thereafter, and the appropriate answer back is received or (b) if given by mail, three (3) days after mailed by registered or certified mail (return receipt requested) or (c) if given by express courier, on the day delivered by an express courier (with confirmation from recipient) to the following addresses:

    (a)  if to the Company, to:
        GeoSynFuels, LLC
        12345 West Alameda Parkway, Suite 310
        Lakewood, Colorado 80228
        Attention: Chairman
        Facsimile No.: (303) 277-1772

    (b)  if to the Subscriber, to its mailing address and facsimile number as shown on Appendix B to this Agreement.

Notice of any change in any address or facsimile number shall also be given in the manner set forth above. Whenever the giving of notice is required, the giving of such notice may be waived by the party entitled to receive such notice.

4.2    Entire Agreement. This Agreement contains the entire agreement between the parties hereto with respect to the matters contemplated herein and supersedes all prior agreements or understandings among the parties related to such matters.

4.3    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4.4    Amendment and Modification. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms or covenants hereof may be waived, only by a written instrument executed by all of the parties hereto or, in the case of a waiver, by the party waiving compliance. Except as otherwise specifically provided in this Agreement, no waiver by either party hereto of any breach by the other party hereto of any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of a similar or dissimilar provision or condition at the same or at any prior or subsequent time.

4.5    Governing Law. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

4.6    Headings. Headings to the sections in this Agreement are intended solely for convenience, and no provision of this Agreement is to be construed by reference to the heading of any section.

4.7    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same agreement.

4.8    Fees and Expenses. The Company, on the one hand, and the Subscriber, on the other hand, shall pay the respective fees and expenses incurred by them in connection with the transactions contemplated herein.

4.9    Severability. Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms and provisions of this Agreement in any other jurisdiction.

4.10    Further Actions. The parties hereto agree to execute such further instruments and to take such further actions as may reasonably be necessary to carry out the intent of this Agreement.

4.11    Power of Attorney. The Subscriber does hereby irrevocably constitute and appoint each of Desmond P. Kearns and Eli S. Jacobs, with full power of substitution, the true and lawful attorney-in-fact and agent of the Subscriber, to execute, acknowledge, verify, swear to, deliver, record and file, in its name, place and stead, all instruments, documents and certificates that may from time to time be required by the laws of the United States, the State of Delaware, or any

other jurisdiction in which the Company at any time or from time to time conducts or plans to conduct business, or any political subdivision or agency thereof, or by the Limited Liability Company Operating Agreement of the Company (the "LLC Agreement"), or that either such attorney-in-fact and agent determines to be appropriate, to admit the Subscriber as a Member in the Company following the Company's acceptance of the Subscriber's subscription, including a Joinder Agreement to the LLC Agreement. This power of attorney shall not be affected by the subsequent disability or incompetence of the Subscriber. This power of attorney shall be deemed to be coupled with an interest, shall be irrevocable, shall survive and not be affected by the dissolution, bankruptcy or legal disability of the Subscriber and shall extend to the Subscriber's successors and assigns. Any person dealing with the Company may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized and binding, without further inquiry.

*[remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement this 24ᵗʰ day of MARCH , 2008.

INDIVIDUAL SUBSCRIBER:

ADAM SOLOMON IRA
(Name of Individual Subscriber)

_(Signature)_

ENTITY SUBSCRIBER:

_____
(Name of Entity Subscriber)

By: _____
     Name:
     Title:

Number of Common Shares Purchased:    11,538.5
Aggregate Purchase Price:    $  300,000

Agreed and Accepted
this 31ˢᵗ day of MARCH , 2008.

GEOSYNFUELS, LLC

By: _____
     Name: JOSHUA SAVGE
     Title: DIRECTOR OF FINANCE

## APPENDIX A

<u>Accredited Investor Status</u>. Please mark the appropriate box next to each description applicable to you.

[ X ]  A natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.

[ X ]  A natural person who had individual income in excess of $200,000 in each of the most recent two years or joint income with that person's spouse in excess of $300,000 in each of the most recent two years and who has a reasonable expectation of reaching the same income level in the current year.

[    ]  A director or executive officer (as defined in Rule 501(f) of Regulation D promulgated under the Securities Act) of the Company.

[    ]  A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act) whether acting in its individual or fiduciary capacity.

[    ]  A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

[    ]  An insurance company (as defined in Section 2(13) of the Securities Act).

[    ]  An investment company registered under the Investment Company Act of 1940 (the "Investment Company Act") or a business development company (as defined in Section 2(a)(48) of the Investment Company Act).

[    ]  A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

[    ]  A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

[    ]  An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") if (A) the investment decision is made by a plan fiduciary (as defined in Section 3(21) of ERISA) which is either a bank, savings and loan association, insurance company or registered investment advisor, or (B) the employee benefit plan has total assets in excess of $5,000,000, or (C) if the plan is a self-directed plan, its investment decisions are made solely by persons who are accredited investors.

[    ]  A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

[    ]  An organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or a Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Common Shares, with total assets in excess of $5,000,000.

[ ] A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Common Shares, whose acquisition is directed by a person who, either alone or with his or her purchaser representative(s), has such knowledge and experience in financial business matters that such person is capable of evaluating the merits and risks of acquiring the Common Shares.

[ X ] An entity in which each of the equity owners meet the requirements of at least one of the above subparagraphs for accredited investors.

**APPENDIX B**

<u>General Information.</u> Please print or type the following information about you:

<u>PART A.</u>    (TO BE COMPLETED BY NATURAL PERSONS)

Full Name: ADAM SOLOMON IRA

Residence Address: 956 FIFTH AVE. 10th FLOOR
<span>Number</span> <span>Street</span>

NEW YORK        NY        10075
<span>City</span> <span>State</span> <span>Zip</span>

Telephone Number: (212) 628-1649 Facsimile Number:

Email Address: asolomon @ stonewatercap.com

Name of Employer: STONEWATER CAPITAL LLC

Business Address and Telephone Number: 12 EAST 49 ST, 36 FLOOR

NEW YORK, NY 10017

Telephone Number: (212) 231-0050 Facsimile Number: (212) 231-0041

Social Security Number: 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

<u>PART B.</u>    (TO BE COMPLETED BY ENTITIES)

Name:

Business Address:
<span>Number</span> <span>Street</span>

<span>City</span> <span>State</span> <span>Zip</span>

Telephone Number: _____ Facsimile Number:

Email Address:

Name and Title of Individual Executing Questionnaire:

Principal Business:

State and Year of Organization:

Tax Identification Number:

# Exhibit B

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement this 24th day of ___MARCH___, 2008.

INDIVIDUAL SUBSCRIBER:

_____
(Name of Individual Subscriber)


_____
(Signature)

ENTITY SUBSCRIBER:
ANTHONY M SOLOMON CHARITABLE
LEAD  ANNUITY TRUST
(Name of Entity Subscriber)

By: _____
Name:  ADAM  SOLOMON
Title:  TRUSTEE


Number of Common Shares Purchased:       3,846
Aggregate Purchase Price:            $   100,000


Agreed and Accepted
this _____ day of _____, 2007

GEOSYNFUELS, LLC

By: _____
        Name:
        Title:

## APPENDIX A

<u>Accredited Investor Status</u>. Please mark the appropriate box next to each description applicable to you.

[___] A natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.

[___] A natural person who had individual income in excess of $200,000 in each of the most recent two years or joint income with that person's spouse in excess of $300,000 in each of the most recent two years and who has a reasonable expectation of reaching the same income level in the current year.

[___] A director or executive officer (as defined in Rule 501(f) of Regulation D promulgated under the Securities Act) of the Company.

[___] A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act) whether acting in its individual or fiduciary capacity.

[___] A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

[___] An insurance company (as defined in Section 2(13) of the Securities Act).

[___] An investment company registered under the Investment Company Act of 1940 (the "Investment Company Act") or a business development company (as defined in Section 2(a)(48) of the Investment Company Act).

[___] A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

[___] A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

[___] An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") if (A) the investment decision is made by a plan fiduciary (as defined in Section 3(21) of ERISA) which is either a bank, savings and loan association, insurance company or registered investment advisor, or (B) the employee benefit plan has total assets in excess of $5,000,000, or (C) if the plan is a self-directed plan, its investment decisions are made solely by persons who are accredited investors.

[___] A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

[___] An organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or a Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Common Shares, with total assets in excess of $5,000,000.

 A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Common Shares, whose acquisition is directed by a person who, either alone or with his or her purchaser representative(s), has such knowledge and experience in financial business matters that such person is capable of evaluating the merits and risks of acquiring the Common Shares.

 An entity in which each of the equity owners meet the requirements of at least one of the above subparagraphs for accredited investors.

**APPENDIX B**

<u>General Information</u>. Please print or type the following information about you:

<u>PART A.</u>    (<u>TO BE COMPLETED BY NATURAL PERSONS</u>)

Full Name: _____

Residence Address: _____

                           Number          Street

                           City         State     Zip

Telephone Number: _____ Facsimile Number: _____

Email Address: _____

Name of Employer: _____

Business Address and Telephone Number: _____

_____

Telephone Number: _____ Facsimile Number: _____

Social Security Number: _____-_____-_____

<u>PART B.</u>    (<u>TO BE COMPLETED BY ENTITIES</u>)

Name: ___ANTHONY M SOLOMON CHARITABLE LEAD ANNUITY TRUST___

Business Address: ___C/O STONEWATER CAPITAL LLC, 12 EAST 49 ST. 36 FLOOR___

                         Number          Street

   ___NEW YORK___       ___NY___   ___10017___

                        City         State     Zip

Telephone Number: _(212) 231-0050_ Facsimile Number: _(212) 231-0041_

Email Address: ___asolomon @ stonewatercap.com___

Name and Title of Individual Executing Questionnaire: ___ADAM SOLOMON, TRUSTEE___

Principal Business: ___CHARITY___

State and Year of Organization: ___NEW YORK, 2004___

Tax Identification Number: ___20-6109943___

# Exhibit C

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement this 24ᵗʰ day of ___MARCH___, 200̶7̶8.

INDIVIDUAL SUBSCRIBER:

_____
(Name of Individual Subscriber)

_____
(Signature)

Number of Common Shares Purchased:
Aggregate Purchase Price:

ENTITY SUBSCRIBER:

_Peter Adam Solomon Trust_
(Name of Entity Subscriber)

By: _____
Name: Trustee
Title: Tracy Solomon

1,9236 e⁴26

$ 50,000

Agreed and Accepted
this _____ day of _____, 2007

GEOSYNFUELS, LLC

By: _____
        Name:
        Title:

**APPENDIX A**

Accredited Investor Status. Please mark the appropriate box next to each description applicable to you.

[___]  A natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.

[___]  A natural person who had individual income in excess of $200,000 in each of the most recent two years or joint income with that person's spouse in excess of $300,000 in each of the most recent two years and who has a reasonable expectation of reaching the same income level in the current year.

[___]  A director or executive officer (as defined in Rule 501(f) of Regulation D promulgated under the Securities Act) of the Company.

[___]  A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act) whether acting in its individual or fiduciary capacity.

[___]  A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

[___]  An insurance company (as defined in Section 2(13) of the Securities Act).

[___]  An investment company registered under the Investment Company Act of 1940 (the "Investment Company Act") or a business development company (as defined in Section 2(a)(48) of the Investment Company Act).

[___]  A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

[___]  A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

[___]  An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") if (A) the investment decision is made by a plan fiduciary (as defined in Section 3(21) of ERISA) which is either a bank, savings and loan association, insurance company or registered investment advisor, or (B) the employee benefit plan has total assets in excess of $5,000,000, or (C) if the plan is a self-directed plan, its investment decisions are made solely by persons who are accredited investors.

[___]  A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

[___]  An organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or a Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Common Shares, with total assets in excess of $5,000,000.

[___] A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Common Shares, whose acquisition is directed by a person who, either alone or with his or her purchaser representative(s), has such knowledge and experience in financial business matters that such person is capable of evaluating the merits and risks of acquiring the Common Shares.

[X] An entity in which each of the equity owners meet the requirements of at least one of the above subparagraphs for accredited investors.

## APPENDIX B

General Information. Please print or type the following information about you:

PART A.      (TO BE COMPLETED BY NATURAL PERSONS)

Full Name: _____

Residence Address: _____

                  Number         Street

                  City        State     Zip

Telephone Number: _____  Facsimile Number: _____

Email Address: _____

Name of Employer: _____

Business Address and Telephone Number: _____

Telephone Number: _____  Facsimile Number: _____

Social Security Number: _____-__-____

PART B.      (TO BE COMPLETED BY ENTITIES)

Name: _Peter Adam Solomon Trust_

Business Address: _C/O Tracy Solomon Trustee_

                  Number         Street

_46 Convent ct.,   San Rafael,   CA  94901_

                  City        State     Zip

Telephone Number: _415 482-8080_  Facsimile Number: _415-453-9552_

Email Address: _tisolo2003@yahoo.com_

Name and Title of Individual Executing Questionnaire: _Tracy Solomon Trustee_

Principal Business: _N/A_

State and Year of Organization: _N/A_

Tax Identification Number: _13-6891052_

# Exhibit D

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement this
24ᵗʰ day of   MARCH   , 2008.

INDIVIDUAL SUBSCRIBER:

_____
(Name of Individual Subscriber)

_____
(Signature)

ENTITY SUBSCRIBER:

James Slater Solomon Trust
(Name of Entity Subscriber)

By: _____
    Name: Tracy Solomon
    Title: Trustee

Number of Common Shares Purchased:        1,923  @ $26

Aggregate Purchase Price:              $    50,000

Agreed and Accepted
this _____ day of _____, 2007

GEOSYNFUELS, LLC

By: _____
    Name:
    Title:

## APPENDIX A

<u>Accredited Investor Status.</u>  Please mark the appropriate box next to each description applicable to you.

[____]  A natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.

[____]  A natural person who had individual income in excess of $200,000 in each of the most recent two years or joint income with that person's spouse in excess of $300,000 in each of the most recent two years and who has a reasonable expectation of reaching the same income level in the current year.

[____]  A director or executive officer (as defined in Rule 501(f) of Regulation D promulgated under the Securities Act) of the Company.

[____]  A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act) whether acting in its individual or fiduciary capacity.

[____]  A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

[____]  An insurance company (as defined in Section 2(13) of the Securities Act).

[____]  An investment company registered under the Investment Company Act of 1940 (the "Investment Company Act") or a business development company (as defined in Section 2(a)(48) of the Investment Company Act).

[____]  A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

[____]  A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

[____]  An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") if (A) the investment decision is made by a plan fiduciary (as defined in Section 3(21) of ERISA) which is either a bank, savings and loan association, insurance company or registered investment advisor, or (B) the employee benefit plan has total assets in excess of $5,000,000, or (C) if the plan is a self-directed plan, its investment decisions are made solely by persons who are accredited investors.

[____]  A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

[____]  An organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or a Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Common Shares, with total assets in excess of $5,000,000.

[___]    A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Common Shares, whose acquisition is directed by a person who, either alone or with his or her purchaser representative(s), has such knowledge and experience in financial business matters that such person is capable of evaluating the merits and risks of acquiring the Common Shares.

[X]    An entity in which each of the equity owners meet the requirements of at least one of the above subparagraphs for accredited investors.

## APPENDIX B

<u>General Information</u>. Please print or type the following information about you:

**PART A.**    (TO BE COMPLETED BY NATURAL PERSONS)

Full Name: _____

Residence Address: _____
                    Number              Street

                    _____
                    City              State          Zip

Telephone Number: _____ Facsimile Number: _____

Email Address: _____

Name of Employer: _____

Business Address and Telephone Number: _____

_____

Telephone Number: _____ Facsimile Number: _____

Social Security Number: _____

**PART B.**    (TO BE COMPLETED BY ENTITIES)

Name: _____James Slater Solomon Trust____

Business Address: _____C/o Tracy Solomon Trustee____
                      Number                    Street

                 _____46 Convent Ct, San Rafael, CA 94901____
                      City              State          Zip

Telephone Number: _415 482-8080_ Facsimile Number: _415- 453-9552_

Email Address: _____tjsolo2003 @ yahoo.com____

Name and Title of Individual Executing Questionnaire: _Tracy Solomon, Trustee_

Principal Business: _____N/A____

State and Year of Organization: _____N/A____

Tax Identification Number: _____13-6891053____

# Exhibit E

## SUBSCRIPTION PROCEDURES

In order to subscribe for and purchase Common Shares, each prospective investor must deliver to the Company, as promptly as practicable, but no later than the date of termination of the Offering, (i) two originally executed completed copies of the Subscription Agreement delivered with this Memorandum, and (ii) an amount equal to the aggregate purchase price for the Common Shares subscribed for by the investor in a certified or official bank check, or by wire transfer to the Company's account as set forth in the Subscription Agreement. The Offering is not being made subject to any minimum number of Common Shares being subscribed for and purchased. More than one closing of the Offering may be held until termination of the Offering.

The Company will notify each prospective investor whether such prospective investor's subscription has been accepted in whole or in part. The Company reserves the right to reject any subscription for any reason, in whole or in part, in its sole discretion. Subscription Agreements are not binding on the Company until accepted by the Company. If the Company rejects all or a portion of any subscription, the Company will promptly mail to the prospective investor a check for all, or the appropriate portion of, any amount submitted with such investor's subscription.

The Offering will terminate upon the earlier of (i) the sale of all of the Common Shares offered hereby, and (ii) a determination by the Company, in its sole discretion, to terminate the Offering, without notice to the Investors who have already subscribed for and purchased Common Shares.

All subscriptions will be accepted on the basis of the terms described in this Memorandum, including the amount set forth on the cover page hereof relating to the offering price.